**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CASSANDRA WEBB,
*o/b/o C.E., a minor,*

          *Plaintiff,*

*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant.*

_____/

CASE NO. 2:20-CV-12004
DISTRICT JUDGE LAURIE J. MICHELSON
MAGISTRATE JUDGE PATRICIA T. MORRIS

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 17, 20)**

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff, C.E.,[1] is not disabled.  Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (ECF No. 17), be **DENIED**, the Commissioner's Motion for Summary Judgment, (ECF No. 20), be **GRANTED**, and this case be **AFFIRMED**.

## II. REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) under Title XVI, 42 U.S.C. §§ 1381-1383f.  (ECF No. 12, PageID.41.)  Pursuant to 28 U.S.C. §

---

[1] Because C.E. is a minor, the suit is brought by his mother, Cassandra Webb, on his behalf.

636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (ECF No. 7.)   Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (ECF Nos. 17, 20.)

The application for SSI at issue in this case was protectively filed on behalf of the claimant on October 21, 2015, alleging onset on June 15, 2013.  (ECF No. 12, PageID.44.) Plaintiff's claim was denied at the initial level on April 6, 2016.  (*Id.* at PageID.44, 73–76.) After an administrative hearing was held at Plaintiff's request, Administrative Law Judge ("ALJ") Andrew Sloss found that claimant, C.E., had not been disabled from the date the application was filed, through the date of the decision, July 18, 2016.  (*Id.* at PageID.44.) The Appeals Council denied Plaintiff's request for review.  (*Id.* at PageID.30.)  This action followed.  (ECF No. 1.)

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB) (2012); 20 C.F.R. § 416.905(a) (SSI) (2012). A child will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(I). To determine whether a child's impairment results in marked and severe limitations, SSA regulations prescribe a three-step sequential evaluation process:

1. A child will be found "not disabled" if she engages in substantial gainful activity.

3

2.    A child will be found "not disabled" if she does not have a severe impairment or combination of impairments.

3.    A child will be found "disabled" if she has an impairment or combination of impairments that "meets, medically equals, or functionally equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

20 C.F.R. § 416.924(a) (2011).   In the third step of this analysis, the Commissioner assesses the functional limitations caused by the child's impairment(s). *Id.* § 416.926a(a) (2015).  To determine functional equivalence, the regulations direct the Commissioner to evaluate how the child functions in six domains, which are "broad areas of functioning intended to capture all of what a child can or cannot do." *Id.* § 416.926a(b)(1).  These domains are:

1.    Acquiring and using information;

2.    Attending and completing tasks;

3.    Interacting and relating with others;

4.    Moving about and manipulating objects;

5.    Caring for yourself; and

6.    Health and physical well-being.

*Id.*   If the child's impairments result in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairment functionally equals the listing and the child will be found disabled. *Id.* § 416.926a(d).  A marked limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain or complete activities." *Id.* § 416.926a(e)(2)(i).  An extreme limitation is one that "interferes *very* seriously with [a child's] ability to independently initiate, sustain or complete activities." *Id.* §

4

416.926a(e)(3)(i) (emphasis added). "Marked" and "extreme" limitations in a given domain can be established by standardized test scores that are two or three standard deviations, respectively, below the mean—that is, either in the lowest two and a half percent of the distribution or the lowest one percent—provided that the scores are representative of day-to-day functioning. *Id.* §§ 416.926a(e)(2)(iii), 416.926a(e)(3)(iii). Test scores are not conclusive, therefore, and the bulk of 20 C.F.R. § 416.926a is devoted to "general descriptions of each domain" against which a claimant's functioning may be compared.

### D. ALJ Findings

Following the three-step sequential analysis for child claimants, the ALJ determined that C.E. was not disabled. (ECF No. 12, PageID.47.) At step one, the ALJ found that C.E. "was a preschooler on" the application date and that he had not engaged in substantial gainful activity since "October 21, 2015, the application date." (*Id.*) At step two, the ALJ concluded that C.E. had the following severe impairments: asthma and attention-deficit/hyperactivity disorder ("ADHD"). (*Id.*) The ALJ found the following impairments to be non-severe: generally controlled gastroesophageal reflux disease ("GERD") and leukocytosis because both conditions were "transient and resolved . . . before they met the 12-month durational requirement to qualify as a severe impairment." (*Id.*) Additionally, the ALJ found that C.E.'s obesity did not cause "more than minimal functional limitations or materially exacerbate the severity of other conditions. (*Id.* at PageID.47–48.) The ALJ also determined that there was "no medical evidence of record establishing that [C.E. had] a medically determinable impairment involving immune sufficiency, or . . . brittle bone

disease." (*Id.* at PageID.48.)  Neither severe impairment met or medically equaled a listed impairment at step three.  (*Id.* at PageID.48.)  The ALJ next determined that neither C.E.'s ADHD, nor his Asthma, independently, or in combination, functionally equaled a listing. (*Id.* at PageID.50, 58.)  Accordingly, the ALJ concluded that C.E. was not disabled. (*Id.* at PageID.58.)

### E. Administrative Record

#### 1. Medical Evidence

On July 26, 2013, C.E., a fourteen-month-old boy, was hospitalized after ingesting a laundry detergent pod.  (ECF No. 12, PageID.857.)  After ingesting the detergent pod, C.E. drank water, causing the pod to foam up.  (*Id.* at PageID.662.)  C.E. aspirated and sustained a cardiopulmonary arrest.  (*Id.*)  Soon after, C.E. was admitted to Genesys and was later transferred to the University of Michigan Medical Center.  (*Id.*)  C.E. remained in the ICU, on a ventilator, for fourteen days.  Prior to the accident, C.E. had already been diagnosed with asthma.  (*Id.* at PageID.262.)

C.E. underwent a string of hospitalizations following the initial incident.   On December 8, 2013, C.E. was again admitted to the hospital, this time for asthma.  (*Id.* at PageID.419.)  C.E. was treated and was discharged after a couple hours.  (*Id.*)  The following June, C.E. was admitted to the hospital again for Asthma.  (*Id.* at PageID.415–18.)  C.E. was treated and again left after only a couple hours.  (*Id.*)

C.E. was not hospitalized again until August, 2014, when he came down with pneumonia.  (*Id.* at PageID.439–41.)  Hospital records state that C.E.'s pneumonia was an exacerbation of his underlying asthma.  (*Id.* at PageID.441.)  C.E. was treated and

discharged after three days.  (*Id.* at PageID.439–41.)  C.E. was hospitalized again two years later for acute pharyngitis and bronchitis and was discharged the same day.  (*Id.* at PageID.721–23.)

C.E.'s final string of hospitalizations occurred between October and December of 2018.  On October 22, C.E. was again admitted to the hospital for pneumonia, sepsis, and mild hypokalemia.  (*Id.* at PageID.762.)  C.E. was discharged after four days.  (*Id.*)  The next month, C.E. arrived at a follow-up appointment at the pediatric disease clinic.  (*Id.* at PageID.691–93.)  The physician noted that C.E. was "gradually improving" from his recent pneumonia diagnosis.  (*Id.*)  This follow up lasted for less than a day.  (*Id.*)  Just a month later, C.E.'s pneumonia worsened, and he was hospitalized for five days.  (*Id.* at PageID.703–04.)

In addition to his asthma, C.E. has been diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD").  (*Id.* at PageID.693.)  However, C.E. receives no treatment for his ADHD.  (*Id.* at PageID.52.)

Medical consultative examiner, Scott Lazarra, M.D., examined C.E. on March 13, 2016.  (*Id.* at PageID.662.)  Doctor Lazarra noted that C.E. was diagnosed with asthma at age two.[2]  (*Id.* at PageID.662.)  Since C.E.'s initial hospitalization at fourteen months, he has had "chronic scarring in his lungs as well as chronic reflux disease and esophageal ulcerations."  (*Id.*)  C.E. took Zantac twice daily; Claritin daily; and Albuterol, Pulmicort,

---

[2] Although Dr. Lazarra stated that C.E. was diagnosed with asthma at two years of age, hospital records from when C.E. was admitted for ingesting detergent at fourteen months show that he had already been diagnosed with asthma.  (*Compare id. with id.* at PageID.262.)

7

and Dulera inhalers as needed.  (*Id.*)  Doctor Lazarra noted that C.E. enjoys playing outside, but that he easily becomes "fatigued and short of breath."  (*Id.*)  Although C.E. was diagnosed with ADHD, he was "cooperative" at the hearing and "provide[d] good effort."  (*Id.* at PageID.663.)  The following month, a non-examining medical expert opined that based on C.E.'s medical record, C.E. was not disabled and exhibited a less than marked limitation in physical well-being.  (*Id.* at PageID.90.)

### 2.  School Records

C.E.'s first grade teacher noted that C.E. frequently displayed disruptive behavior in the classroom.  (*Id.* at PageID.218.)  Specifically, C.E. was "often off task" and needed "constant redirection" from his teacher.  (*Id.*)  During "quiet" study times, C.E. would often talk to other students, and, even after being reminded to study quietly, C.E. would quickly resume talking to others.  (*Id.*)  He often walked away from his assigned seating, sat on tables, crawled under tables, and walked around the classroom.  (*Id.*)

C.E. struggled academically.  (*Id.*)  He was "below benchmark in reading and writing," but enjoyed math.  (*Id.*)  C.E. was generally unmotivated to complete assignments and frequently failed to finish his work even though these assignments were "at his level academically."  (*Id.*)

At recess, C.E. "struggle[d] to follow school rules."  (*Id.*)  He was often out of his line in the hallways and at the end of recess he would often push other students aside to get a better spot in line.  (*Id.*)  C.E.'s teacher employed a number of strategies to help C.E. focus, such as "moving his desk, moving his carpet spot," giving him a job in the classroom,

8

and giving him a study partner.  (*Id.*)  These efforts "have helped a little," but C.E. still struggled "immensely."  (*Id.*)

### 3.  Application Reports

C.E.'s mother completed a Questionnaire for Children Claiming SSI Benefits, an Asthma questionnaire, and a "Daily Living" questionnaire.  (*Id.* at PageID.194–202.)  On these forms, C.E.'s mother shared that C.E.'s asthma was aggravated by exposure to hot or cold weather and intense or prolonged physical activity.  (*Id.* at PageID.194.)  Treatment with inhalers would typically resolve C.E.'s asthma attacks within one to three minutes. (*Id.*)  C.E.'s asthma limited his ability to play with children his age as he would often become winded well before any of his peers.  (*Id.* at PageID.198.)  Indeed, when running around with other children, C.E. would occasionally wheeze or throw up.  (*Id.*)

Notwithstanding his physical limitations, C.E. "likes to play with anyone."  (*Id.*) His mother described him as "[v]ery shy and friendly" and noted that he "is able to listen to adults."  (*Id.*)  However, she also noted that at times C.E. could be "aggressive."  (*Id.*)

C.E. helped with household chores by putting away his toys and cleaning up his own messes.  (*Id.* at PageID.195.)  Occasionally, C.E. could take basic phone messages. C.E. needed "constant supervision" and could only do a task for "two to three minutes" before losing interest.  (*Id.*)  C.E. often needed help bathing, dressing, and using the restroom.  (*Id.* at PageID.200.)  His mother noted that occasionally he had difficulty comprehending others and that he could be sluggish at times.  (*Id.*)

### 4. Administrative Hearing

At the administrative hearing, the ALJ began by briefly examining C.E.  (*Id.* at PageID.67.)  C.E. stated that at the time he was six years old and in first grade.  (*Id.* at PageID.68.)  He shared that at school he would play on the swings with his friends at recess.  (*Id.*)  C.E. had "a couple" friends outside of school with whom he would play with chalk.  (*Id.*)  Further, C.E. stated that he could ride a bike and that he could engage in some activities during gym class but would have to sit out for many other activities.  (*Id.* at PageID.69.)  C.E.'s counsel declined to ask him any questions.  (*Id.*)

The ALJ then examined C.E.'s mother.  (*Id.* at PageID.70.)  She began by clarifying that C.E. had been "pulled out of school" and was "in a homebound program" as of October 2018, due to his medical conditions.  (*See id.* at PageID.70, 72.)  Under the homebound program, C.E.'s mother would teach him at home on Mondays, Wednesdays, and Fridays.  (*Id.* at PageID.72.)  On Tuesdays and Thursdays, C.E. would go to school to spend an hour with his teacher.  (*Id.*)  Before entering the school, C.E.'s mother would call ahead so that the School could sanitize the classroom.  (*See id.*)

She then discussed C.E.'s medical conditions.  She testified that C.E. "sees a pulmonologist" who has prescribed two different inhalers and a daily Singular chewable.  (*Id.* at PageID.70.)  C.E. had follow up appointments with his pulmonologist "every couple months."  (*Id.*)  Further, during a recent bronchoscopy, doctors discovered bacteria in C.E.'s lower left lung (the same lung "that continuously gets pneumonia"), and, after scraping the lung, prescribed C.E. with antibiotics.  (*Id.* at PageID.70–72.)  C.E. also saw a gastrologist who treated C.E.'s gastroesophageal reflux disease ("GERD").  (*Id.* at PageID.72.)  She also mentioned that C.E. was diagnosed with ADHD.  (*Id.*)

10

After the ALJ finished questioning C.E.'s mother, he allowed C.E.'s counsel to examine her.  (*Id.* at PageID.73–74.)  C.E.'s mother testified that C.E. had also been diagnosed with sleep apnea, pharyngitis, bronchitis, and upper respiratory tract infections. (*Id.* at PageID.74.)  C.E. often contracted the upper respiratory tract infections during hot or cold weather in the winter and summer months.  (*Id.* at PageID.74–75.)  Accordingly, C.E.'s pulmonologist recommended that C.E. only go outside when the weather was between thirty-two and ninety-six degrees.  (*Id.* at PageID.75.)

She also testified that C.E.'s asthma symptoms were exacerbated by physical activity.  (*Id.* at PageID.75–76.)  Activities such as jumping on the trampoline or crying would trigger his asthma and potentially cause him to throw up.  (*Id.* at PageID.76.)

Due to his frequent infections, C.E. was "always on an antibiotic."  (*Id.* at PageID.78.)  In fact, by the time of the hearing, C.E. was "immune to almost five different types of antibiotics." (*Id.*)  Moreover, not only had C.E. become immune to many different antibiotics, but he had weak immune system caused by a "neutrophil deficiency defect." (*Id.* at PageID.77–78.)  This meant that C.E.'s vitamin D levels were abnormally low and that his white blood cell count was elevated.  (*Id.* at PageID.77.)

According to his mother, C.E. developed a fear of dying due to his many illnesses and hospitalizations.  (*Id.* at PageID.76.)  He was "afraid to do certain things" that a boy of his age would normally do.  (*Id.*)  He expressed that he was afraid of rain because he did not want "to catch pneumonia." (*Id.*)  He also expressed fear of hospitalization after getting a splinter.  (*Id.*)

## F.  Governing Law

11

Because Plaintiff's disability claim was filed on October 21, 2015, this Court will apply the regulations applicable at the time. Regulations promulgated after the application date, including those promulgated in 2017, are not applicable.

The administrative law judge ("ALJ") must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2015). "Acceptable medical sources" include, but are not limited to, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527 (2015). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure the claimant's residual functioning capacity ("RFC"). *Id.* § 404.1527(d).

12

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and [the] specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Plaintiff's claim was filed before March 27, 2017, Plaintiff continues to receive the benefit of the "treating source rule" found in § 404.1527. Because Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

13

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination.   20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).   Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242.

For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence.   *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC.   The statute lays the groundwork for this, stating, "[a]n individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require."   42 U.S.C. § 423(d)(5)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).   The RFC "is the most he [or she] can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record."   20 C.F.R. § 404.1545 (a)(1) (2021).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined

14

in the Social Security Ruling.  SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  This analysis and the conclusions drawn from it—formerly termed a credibility determination[3]—can be disturbed only for a "compelling reason."  *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

### G.  Analysis

Plaintiff argues that this case should be remanded because the administrative law judge ("ALJ") erred in his step three analysis.  Specifically, Plaintiff argues: (1) that the ALJ did not rely on substantial evidence in finding that C.E.'s asthma-related hospitalizations did not satisfy listing 103.03; (2) that, alternatively, the ALJ's decision both lacked substantial evidence to find that plaintiff's pneumonia hospitalizations were not  medically equivalent to asthma and failed to sufficiently articulate the ALJ's rationale; and (3) that the ALJ did not rely on substantial evidence in finding that C.E.'s impairments were not functionally equivalent to asthma.  Additionally, Plaintiff argues that the ALJ improperly discounted C.E.'s testimony regarding C.E.'s impairments.  For the following reasons, Plaintiff's arguments fail.  Plaintiff's Motion for Summary Judgment should be

---

[3] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

denied, Defendant's Motion for Summary judgment should be granted, and the decision should be affirmed.

### i. Listing 103.03

Plaintiff first argues that the ALJ failed to rely on substantial evidence in finding that C.E.'s asthma did not meet listing 103.03.  By satisfying a listing, a claimant is conclusively considered disabled.  *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).  To meet the requirements of 103.03, a claimant must show that he or she has asthma with:

> [e]xacerbations or complications requiring three hospitalizations within a 12–month period and at least 30 days apart (the 12–month period must occur within the period we are considering in connection with your application or continuing disability review).  Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03 (2021).[4]

Here, C.E. has not met the requirements of listing 103.03.  Plaintiff points to three hospitalizations between 2012 and 2014 that arguably satisfy listing 103.03.  (ECF No. 17, PageID.856–57.)  First, C.E. was initially admitted into the hospital on July 26, 2013.  (ECF No. 12, PageID.262.)  Notably, listing 103.03 requires not simply that the claimant be hospitalized three times in a twelve-month period, but that the hospitalizations must stem from the claimant's asthma.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03.  C.E.'s initial

---

[4] I recognize that the current requirements in listing 103.03, which are cited by the ALJ and both parties, were promulgated after Plaintiff's claim was originally filed.  However, the Sixth Circuit has held that changes to listing requirements are generally "procedural" and therefore do not raise retroactivity concerns. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 645–49 (6th Cir. 2006).  Therefore, although the requirements of listing 103.03 have changed between Plaintiff's original claim and the time of the ALJ's decision, the elements of listing 103.03 at the time of his decision are applicable.

hospitalization, however, was not related to his asthma—C.E. was hospitalized for "caustic poisoning" and an "altered mental status" after C.E. had ingested a laundry detergent pod. (ECF No. 12 at PageID.262.)  Moreover, there is substantial evidence in the record to show that C.E.'s asthma did not arise out of this initial hospitalization, as C.E. had been diagnosed with asthma prior to the July 26 accident.  (*Id.*)

C.E. was hospitalized a second time on December 8, 2013; however, this hospitalization lasted for only two hours and seven minutes—far below the required forty-eight hours under listing 103.03.  (*Id.* at PageID.262.)  Similarly, C.E.'s next hospitalization on June 9, 2014, lasted for less than two hours.  (*Id.* at PageID.415–18.)  Because none of these three hospitalizations meet the requirements of 103.03, I suggest finding that the ALJ's finding that the listing had not been satisfied is supported by substantial evidence.

### ii.  Medical Equivalence

Next, Plaintiff argues that even if C.E. did not meet the requirements of Listing 103.03, this Court should still remand the ALJ's decision because the ALJ: (1) failed to consider whether C.E.'s pneumonia hospitalizations were medically equivalent to the asthma listing, and (2) did not adequately articulate his reasoning for finding that C.E.'s asthma was not medically equivalent to the listing.

First, I turn to whether the ALJ erred by not considering whether C.E's pneumonia hospitalizations were medically equivalent to asthma.  In addition to showing that his or her impairment met a listing, a claimant may also show that he or she is disabled under step 3 by showing that his condition is medically equivalent to a listing.  20 C.F.R. § 416.924(a).  The regulations allow for claimants to show medical equivalence under three

17

circumstances: (1) the claimant has a listed impairment but either cannot show findings that meet one or more criteria or cannot show that his findings are as severe as the listing's criteria; (2) the clamant has a medical impairment that is not covered by any listing; or (3) the claimant has a combination of impairments that do not meet any listing. *Id.* § 416.924(b). Under each prong, the claimant must present findings that are "of equal medical significance" to the requirements of the closest listed impairment. *Id.* Here, because Plaintiff argues that C.E.'s hospitalizations for pneumonia, either on their own or in conjunction with his asthma hospitalizations, are medically equivalent to the listing for asthma, Plaintiff's argument is properly analyzed under the second and third prongs of 20 C.F.R. § 416.924(a).

For a claimant with an unlisted impairment or combination of impairments to show that his impairment is "medically equivalent," the claimant must "present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531; *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th Cir. 2011).

Here, Plaintiff cannot show that C.E.'s pneumonia was as severe as the listing requirements for asthma. Because a claimant must show that his impairment is as severe as every criteria for the most similar impairment, Plaintiff must show that, as Plaintiff would under the asthma listing, C.E. had at least three forty-eight hour minimum hospitalizations, no fewer than thirty days apart, in a twelve month period. *See Sullivan*, 493 U.S. at 531; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03. Based on the evidence in the record, Plaintiff cannot show this. Following C.E.'s hospitalization on June 9, 2014,

C.E. was again hospitalized on August 22, 2014 for pharyngitis and bronchitis.[5]  (*Id.* at PageID.438–40.)   Four years later, C.E. was hospitalized in October, November, and December of 2018.  (*Id.* at PageID.674–75, 662, 694–95.)   The October and December hospitalizations lasted for three and five days, respectively, well over the forty-eight-hour requirement.  (*Id.* at PageID.674–75, 694–95).   However, in November of 2018, C.E. was not hospitalized, but was instead seen for only two hours at a follow-up appointment.  (*Id.* at PageID.662.)   Therefore, because C.E. was only hospitalized twice for more than 48 hours in a twelve-month window, his pneumonia was not "of equal medical significance" to the listing requirements for asthma.[6]

Turning next to whether the ALJ sufficiently articulated his rationale for not finding a medical equivalence, an ALJ must generally "include a discussion of 'findings and conclusions, and the reasons or basis therefor . . .'" which is adequate to "facilitate effective and meaningful judicial review."  *Reynolds*, 424 F. App'x at 414.   Without this analysis, "it is impossible to say that the ALJ's decision at step three was supported by substantial evidence."  *Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 304 (6th Cir. 2019) (quoting *Reynolds*, 424 F. App'x at 416).   However, where an ALJ finds that a claimant's

---

[5] Plaintiff also argues that the hospitalizations on, and following, August 22, 2014, were asthma exacerbations—not simply medically equivalent impairments—and accordingly are relevant in determining whether C.E. had met listing 103.03.  (ECF No. 17, PageID.857).   Even assuming that they were asthma exacerbations, this finding would not affect the analysis because C.E.'s hospitalization in August 2014 was more than four years removed from his only two other qualifying hospitalizations in October and December of 2018.  (R. 12 at PageID.438–40, 674–75, 694–95).

[6] Similarly, insofar as Plaintiff may argue that the asthma hospitalizations on their own were medical equivalent to listing 103.03, this Court should hold that the ALJ relied on substantial evidence in finding no medical equivalence because Plaintiff cannot provide any additional findings to show that C.E.'s asthma was "at least of equal medical significance to [all] the required criteria" in listing 103.03.  20 C.F.R..1526(b)(1).

impairments do *not* medically equal a listing, the ALJ "is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." SSR 17-2p, 2017 WL 3928306, at *4 (Mar. 27, 2017).[7]  A conclusory "statement that the individual's impairment(s) does not medically equal a listed impairment" will generally "constitute sufficient articulation" because the ALJ's "articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step [three]."[8]  SSR 17-2p, 2017 WL 3928306, at *4.

For example, in *Cooper v. Commissioner of Soc. Sec.*, this Court held that where an ALJ made a conclusory statement that the claimant's impairment was not medically equivalent to any listing, without providing any further explanation, the ALJ sufficiently articulated his finding.  No. 18-12611, 2019 WL 2240711, at *4–5 (E.D. Mich. Apr. 8, 2019).  Specifically, although the ALJ merely stated that the claimant did "not have an

---

[7] While SSR 17-2p was promulgated after Plaintiff filed her claim, this Court has recognized that SSR 17-2p has retroactive effect.  *Balknight v. Comm'r of Soc. Sec.*, No. 18-11843, 2019 WL 4011881, at *26 (E.D. Mich. July 31, 2019) (citing Commissioner's Hearings, Appeals, and Litigation Law Manual, I-5-3-30, 2017 WL 1362776, at *5 (instructing that although the old rules apply to claims filed before March 27, 2017, ALJ's are to cite SSR 17-2p "[f]or claims(s) filed before March 27, 2017."); *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 224 (1988) (stating that retroactivity is "looked upon with disfavor" except for where an agency, with congressional authorization, clearly expresses that its rule(s) be applied retroactively.").  Accordingly, the minimal articulation requirement set forth in SSR 17-2p, and not the more demanding requirement from *Pasiak*, applies here.

[8] Indeed, the ALJ's discussion of whether C.E. had met listing 103.3 provides rationale for this Court to determine the ALJ's basis for not finding medical equivalence with respect to C.E.'s pneumonia.  The ALJ reasoned that not only had "no medical source" opined any "equivalence of listing 103.3," but that the record contained no medical evidence of "complications requiring three hospitalizations, lasting at least [forty-eight] hours, within a [twelve] month period and at least [thirty] days apart.  (R. 12 at PageID.48).  For the same reason, the ALJ could not have found that C.E.'s pneumonia was medically equivalent to his asthma.

impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[,]" this Court reasoned that, pursuant to SSR 17-2p, no further explanation was required because the ALJ determined that the claimant's impairments did not medically equal any listed impairments. *Id.* at 5; *cf. Anderson v. Comm'r of Soc. Sec.*, No. 2:18-cv-12334, 2019 WL 3933742, at *4 (E.D. Mich. Aug. 2, 2019); *Jammer v. Comm'r of Soc. Sec.*, No. 18-10445, 2019 WL 1372171, at *8 (E.D. Mich. Feb. 22, 2019).

Similarly, here, the ALJ, after considering "the entire record," concluded that C.E. did not "have an impairment or combination of impairments that [met] or medically [equaled] the severity of" a listed impairment. (ECF No. 12, PageID.47–48.) The ALJ recognized that the record contained no medical expert opinions regarding whether C.E.'s impairments were medically equivalent to a listing section, but the ALJ provided no further explanation. (*Id.* at PageID.48.) However, under SSR 17-2p, because the ALJ decided that C.E. did not have a medically equivalent impairment, this conclusory finding was all that the ALJ was required to state.

Further, even if the ALJ did not adequately articulate its reasoning for not finding that C.E.'s impairments medically equaled a listing, such an error would have been harmless. An ALJ generally commits reversible error where he fails to sufficiently articulate his reasoning for failing to find a medically equivalent impairment. *Reynolds*, 424 F. App'x at 416. However, such an error will not be reversed if it was harmless to the plaintiff. *M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp.2d 846, 859 (E.D. Mich. 2012). To demonstrate harm a plaintiff "must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he has satisfied a

listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (citing *Sheeks v. Comm'r of Soc. Sec. Admin.*, 554 F. App'x 641, 641–42 (6th Cir. 2013)). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.*; *Reynolds*, 424 F. App'x at 416 (holding that the ALJ's failure to articulate did not constitute harmless error *only* because it was possible that the evidence the claimant put forth could meet the listing). Without such a showing, the ALJ's decision will be, at most, harmless error, and accordingly will not be remanded. *Smith-Johnson*, 579 F. App'x at 432.

Plaintiff has provided no evidence that could possibly show that C.E.'s impairments medically equaled listing 103.3. There is no evidence in the record that the ALJ could have relied on to show that C.E. was hospitalized for pneumonia three times, for at least forty-eight hours per hospitalization, in a 12-month period. Accordingly, even if the ALJ failed to sufficiently articulate his decision, this error would not have harmed Plaintiff.

### iii.  Functional Equivalency

For a claimant to functionally equal the listings, he must establish "marked" limitations in two of the domains outlined above, or "extreme" limitations in one. 20 C.F.R. § 416.926a(d) (2021). Here, the ALJ found a "marked" limitation in the domain of "caring for himself," limitations that fell short of "marked" in the "acquiring and using information" and "attending and completing tasks" domains, and no limitations in the remaining domains. Plaintiff argues that the ALJ should additionally have found "marked,

if not extreme" limitations in all domains besides the domains of "moving and manipulating" objects "and caring for himself."[9]  (ECF No. 17, PageID.859.)

### a.    Acquiring and Using Information

Turning first to the domain of "acquiring and using information," the ALJ relied on substantial evidence in finding that C.E. did not exhibit any marked limitation.   In evaluating this domain, an ALJ should consider the child's ability to "understand and use new information."  *See* 20 C.F.R. § 416.926a(g)(1).  The regulations provide different benchmarks for various age groups as to their ability to learn and apply new information. The regulations provide that a child between three and six years of age should begin to learn reading, writing, and arithmetic by engaging in activities such as counting, coloring, and telling stories.  *Id.* § 416.926a(g)(2)(ii).  A child from ages six through twelve should progress in writing, reading and math to such an extent that they can solve math problems, produce written and oral projects, and do group work.   *Id.* § 416.926a(g)(2)(iii). Additionally, the regulations provide an inexhaustive list examples of behaviors that are consistent with limited functioning, such as difficulty in arithmetic, difficulty recalling information learned in school, and an inability to "demonstrate understanding of words about space, size, or time."  *Id.* § 416.926a(g)(3).  None of these examples, however, are dispositive in finding a "marked" or "extreme" impairment.  *Id.*

---

[9] Because plaintiff does not challenge the ALJ's findings in the domains of "moving and manipulating objects" and "caring for himself," this Court will limit its consideration to the remaining four domains.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490–91 (6th Cir. 1990) ("[W]e limit our consideration to the particular points that [Plaintiff] appears to raise in her brief on appeal.").

While the ALJ acknowledged that although C.E. was impaired by his ADHD, this impairment did not cause a marked limitation.  (ECF No.12, PageID.52.)  Although C.E. displayed "disruptive behaviors" in class and performed below his grade-level in reading and writing, he nonetheless "received no treatment" for his ADHD, did not show any "signs of mental anomalies at the hearing," performed well in math, and had no medical record that showed the presence of a notable cognitive deficit.  (*Id.*)

Plaintiff argues that the ALJ erroneously relied on certain evidence.  Specifically, the ALJ found that C.E.'s teacher stated he "was doing well in mathematics," when in reality she had merely testified that C.E. "liked" mathematics.  (R. 17 at PageID.861.)  Additionally, the ALJ found that there was no evidence of cognitive or social deficits in the medical records, even though the medical records related to C.E.'s asthma and pneumonia, not his ADHD.[10]  (ECF No. 17, PageID.861.)  Even so, the ALJ still relied on substantial evidence.  First, the fact that C.E. never received treatment for his ADHD tends to show that his impairment may not have seriously interfered with his ability to acquire and learn information.  *See Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 335 (6th Cir. 2007) (holding that even "modest treatment . . . is inconsistent with a finding of disability.").  Further, the ALJ, after conducting an in-person (albeit, brief) examination of C.E., noted that C.E. did not display any signs of cognitive difficulties consistent with his ADHD diagnosis.  (ECF No. 12, PageID.52.)  Moreover, even taking Plaintiff's criticisms

---

[10] Although the medical records were primarily related to C.E.'s asthma condition, they still commented on C.E.'s generally calm, temperate demeanor.  (*E.g.*, ECF No. 12, PageID.667–68, 692, 710, 747, 759.)

24

of the ALJ's reasoning at face value, the facts that C.E. enjoys math and that his medical reports did not mention any cognitive issues tend to support the ALJ's decision.

Plaintiff presents several facts from the record that may support a finding that C.E. had a marked or extreme impairment; however, "[t]he fact that the record may contain evidence to support a different conclusion . . . is irrelevant"—the Court's inquiry is limited to whether substantial evidence supports the ALJ's decision. *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 440 (6th Cir. 2017) (quoting *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986)). Notwithstanding the existence of conflicting evidence, the ALJ's decision was supported by substantial evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (stating that the Court will neither "resolve conflicts in the evidence, nor decide questions of credibility.").

Plaintiff also argues that the ALJ erred by not considering the effect of C.E.'s asthma in conjunction with C.E.'s ADHD, as the ALJ is required to do under 20 C.F.R. § 416.926a(e)(1)(i). This assertion is incorrect because the ALJ considered a medical opinion that opined on the effect of C.E.'s asthma on his ability to acquire and use information. (ECF No. 12, PageID.50–51, 88–89.) Moreover, the ALJ expressly stated that C.E. did "not have . . . [a] combination of impairments that functionally" equaled a listing. (*Id.* at PageID.48); *cf. Douglas ex rel. Patterson v. Comm'r of Soc. Sec.*, No. 04-16235, 2005 WL 3116634, at *1 (11th Cir. 2005) (holding that an ALJ's statement that he considered the claimant's impairments in combination was sufficient to show that the ALJ had considered all of the claimant's impairments in conjunction).

**b.    Attending and Completing Tasks**

25

Plaintiff next argues that the ALJ did not rely on substantial evidence in finding that C.E. had a less than marked limitation in attending and completing tasks.  Plaintiff's argument fails.  This domain considers the child's ability to "focus and maintain" his concentration on activities.  20 C.F.R. § 416.926a(h).  Like the regulations for "acquiring and using information," the regulations for this domain set different standards for varying age groups.  *Id.* § 416.926a(h)(2).  Children from ages three to six "should be able to pay attention when [they] are spoken to directly, sustain attention to [their] play and learning activities, and concentrate on [their] activities."  *Id.* § 416.926a(h)(2)(iii).  Children from ages six to twelve should generally be able to focus their attention on "classroom and homework assignments" when appropriate and should be able to change "routines without distracting' themselves or others."  *Id.* § 416.926a(h)(2)(iv).  Examples of behavior that may indicate limited functioning include: being easily distracted, struggling to focus on activities of interest to the child, and requiring "extra supervision" to stay engaged in an activity.  *Id.* § 416.926a(h)(3).

The fact that a child has ADHD is not dispositive proof that the child has either a "marked" or "extreme" impairment in this domain.  In *Barnett ex rel. D.B. v. Comm'r of Soc. Sec.*, the Sixth Circuit held that the ALJ relied on substantial evidence in finding that a child had a less than "marked" impairment in "attending and completing tasks" even though the child had ADHD.  573 F. App'x 461, 464 (6th Cir. 2014).  The Court reasoned that although the child had ADHD, other factors, such as the child's use of medication, his ability to "'maintain attention' when motivated and 'when working one on one,'" and his

ability to complete psychological testing provided substantial evidence that the child did not have a "marked" impairment in this domain.  *Id.*; *see also Gater on behalf of J.G. v. Comm'r of Soc. Sec.*, No. 17-12375, 2018 WL 4517619, at *5 (E.D. Mich. Aug. 13, 2018).

Here, the ALJ relied on the same factors used to decide that C.E. did not have a "marked" impairment in acquiring and using information.  (ECF No. 12 at PageID.53.)  The ALJ again noted that C.E. received no treatment for his ADHD, that C.E. "showed no sign of mental anomalies during the hearing," that C.E. "was doing well in mathematics," and that C.E.'s medical records did not indicate any cognitive defects.  (*Id.*)  Indeed, some C.E.'s medical records stated that he "displayed age-appropriate behavior and mood" and was "cooperative in following commands."  (*Id.* at PageID.663, 747.)  Further, Caleb's mother mentioned that he "is able to listen to adults[,] . . . directions[,] and tasks."  (*Id.* at PageID.198.)  Again, Plaintiff attempts to undermine the ALJ's decision by pointing to substantial evidence that may support a different conclusion; however, this Court cannot remand the ALJ's findings simply because he could have reached a different conclusion.  (ECF No. 17, PageID.863); *see Shepard*, 705 F. App'x at 440.[11]

### c.    Interacting and Relating to Others

The ALJ relied on substantial evidence in finding that C.E. did not have a "marked" impairment in "interacting and relating to others."  This domain considers how well the child "initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s]

---

[11] Plaintiff also complains that the ALJ used the same reasoning, verbatim, as the prior domain.  (ECF No. 17, PageID.863.)  Plaintiff does not expressly argue that this was error, and, unsurprisingly, provides no authority to support that proposition.  Because the ALJ relied on substantial evidence, I see no reason why this alone would be error.

the language of [his] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i). Children from ages three to six should begin to socialize with other children of their own age, and should begin to use words, as opposed to actions, to express themselves. *Id.* § 416.926a(i)(2)(iii). Between ages six and twelve, children should begin to "work in groups[,] . . . develop more lasting friendships with children" their age, and intelligibly "talk to people of all ages." *Id.* § 416.926a(i)(2)(iv).

Here, the ALJ reasoned that the record was "too scant to support the conclusion that any behavioral problems he exhibited interfered with social interaction beyond those already customary to children his age." (ECF No. 12 at PageID.55.) Additionally, C.E. "received no treatment for" his ADHD and the "evidence [did] not show that the impairment negatively affected his ability to interact appropriately with friends, family, and teachers." (*Id.*)

Plaintiff argues that the ALJ erred in his finding in this domain for two reasons. First, Plaintiff argues that the ALJ's reliance on the "scant" record as evidence that C.E. did not exhibit a marked limitation required the ALJ to rely on evidence that did "not exist" in the record. Second, Plaintiff argues that C.E.'s deficiencies in social interaction are well established by the record.

As to Plaintiff's first argument, the ALJ's comparison of C.E. to children of his age was valid because, while an ALJ must generally limit his inquiry to evidence in the record, he may nonetheless rely on "common knowledge and [the] experience of ordinary men" in

28

reaching a decision.  SSR 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017); *see Ackley v. Sec'y of Health & Human Serv.*, 1991 WL 21976, at *2 (6th Cir. 1991) (quoting *McLamore v. Weinberger*, 538 F.2d 572, 575 (4th Cir. 1976)).  Here, the ALJ did not dispute that C.E. displayed disruptive behavior—he instead reasoned that the disruptive behavior displayed by C.E. was common for children of his age and that there was no evidence in the record to prove otherwise.  *Taylor ex rel. S.T. v. Colvin*, No. 1:12 CV 696, 2013 WL 3280314, at *4 (N.D. Ohio June 27, 2013) ("The burden of proof at Step Three of the sequential entitlement to children's social security benefits rests with Plaintiff."); *see Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (stating that an adult claimant holds the burden of proof at step three).  Because the ALJ could properly consider the general behavior of young children, insofar as he relied on "common knowledge and the experience or ordinary" people, and because the plaintiff carried the burden of proof as to this domain, the ALJ's conclusion was supported by substantial evidence when he found that C.E. was no more deficient in the domain of interacting and relating to others than an ordinary child of the same age.  *See Ackley*, 1991 WL 21976 at *2.

Further, the record contains evidence that tends to show that C.E. was capable of interacting and relating to others.  C.E.'s mother mentioned that he is "friendly" and "likes to play with others."  (ECF No. 12, PageID.198.)  She also stated that C.E. speaks in complete sentences, can usually be understood by people who do not know him well, can occasionally take a simple phone message, and listens to adults.  (*Id.* at PageID.198, 200.) C.E. stated that he has friends at school with whom he plays at recess, and notes from his

medical providers state that he cooperated with medical staff.  (*Id.* at PageID.68, 458, 462, 466, 468, 471, 549, 654, 663.)  Accordingly, despite the existence of evidence that would support the opposite conclusion, I suggest finding that the ALJ's decision was supported by substantial evidence.  *See Shepard*, 705 F. App'x at 440.

### d.    Health and Physical Well-Being

Plaintiff argues that the ALJ should have found an "extreme," not just a "marked," impairment in the domain of health and physical well-being.  Plaintiff's argument should be rejected because it does not allege that the ALJ mischaracterized or ignored material evidence; rather, it asks the court to reweigh evidence in her favor, which it cannot do.  *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982).

The health and physical well-being domain considers "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [the plaintiff's] functioning."  20 C.F.R. § 416.926a(l).  When a claimant has an "extreme" limitation in his health and physical well-being, he "will generally have an impairment(s) that 'meets' or 'medically equals' a listing."  *Id.*  The regulations provide examples of medical conditions that will functionally equal the listings.  These include (1)  "complete inability to function independently outside the area of one's home," (2) medically necessary "24–hour–a–day supervision," and (3) "congenital organ dysfunction which could be expected to result in death within the first year of life without surgical correction" that "is expected to be disabling . . . until attainment of [one] year of age."  *Id.* § 416.926a(m).

The ALJ recognized persistent asthma and medical issues but stated that many of his medical issues were either resolved or under control.  (ECF No. 12 at PageID.57.)  He also found that there was insufficient evidence that C.E.'s asthma prevented him from attending school, that C.E. did not display any respiratory problems at the hearing, and that his treatment history showed a "significant degree of physical activity."  (*Id.* at PageID.57–58.)  Accordingly, in weighing the evidence, the ALJ declined to find an "extreme" limitation in this domain.  (*Id.* at PageID.58.)  Moreover, as discussed above, C.E.'s impairments did not meet or medically equal a listing.  *See* 20 C.F.R. § 416.926a(l).

Plaintiff contends that the ALJ should have placed more weight on C.E.'s ability to participate in physical activities and attend school.  Specifically, Plaintiff mentions C.E.'s difficulties playing sports and his limited ability to attend school.  (ECF No. 17 at PageID.865.)  The problem for Plaintiff is that the ALJ did consider these factors, but in weighing the evidence, decided that they did not amount to an "extreme" impairment.  *See Mullins*, 680 F.2d at 472.  Thus, I suggest that substantial evidence supports the ALJ's decision that Plaintiff has marked, not extreme, limitations in the domain of health and physical well-being.

Further, because substantial evidence supports the ALJ's finding of only a "marked" impairment in one domain, I suggest that C.E.'s impairments are not functionally equivalent to the listings.

### iv.  Whether the ALJ Improperly Discounted C.E.'s Testimony Regarding his Impairments

Last, Plaintiff argues that the ALJ improperly discounted the credibility of C.E.'s mother's statements, in part because the ALJ impermissibly substituted his own medical opinion for the medical evidence established in the record.

An ALJ may rely on both medical and nonmedical sources when determining whether a claimant is disabled.  SSR 16-3p, 2017 WL 5180304, at *5–8.  Generally, an ALJ's findings of credibility "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 721 F.3d 525, 531 (6th Cir. 1997).  An ALJ's "credibility findings may not be disturbed absent a compelling reason." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (quotation marks omitted).  Accordingly, arguments that an ALJ "cherry picked" evidence are seldom successful because "the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).  Crediting an argument that the ALJ "cherry picked" evidence would necessarily require the District Court to reweigh the evidence. *Ritchie*, 540 F. App'x at 531.

Plaintiff provides no compelling reason for this Court to second guess the ALJ's credibility determinations.  Plaintiff alleges that the ALJ "distorted and misrepresented" the record, but the ALJ's findings do not support this assertion.  (ECF No. 17, PageID.866–67.)  Plaintiff states that the ALJ made an "unsupportable" attempted to undermine Plaintiff's assertion that C.E. is abnormally afraid of death, yet the ALJ stated that Plaintiff's assertion was unsupported by medical or educational records.  (*Id.*; ECF No. 12, PageID.51.)  Plaintiff also took issue with the ALJ's inference that C.E.'s treatment for

32

slipping on ice evidenced that C.E. enjoys some degree of physical activity because "a slip on ice in winter can happen even if one is outside briefly."  (ECF No. 17, PageID.867.) But the ALJ's inference is, at least to some extent, supported by this fact, and it is corroborated by other facts in the record such as C.E.'s treatment for falling off a bike and C.E.'s statement that he likes to play on swings at recess.  (ECF No. 12 at PageID.49, 68.) Additionally, Plaintiff argues that the ALJ's inference that C.E. is somewhat physically active undermines Plaintiff's assertion that C.E. had to avoid "all physical activity," because Plaintiff had actually testified that C.E.'s physical activity was merely limited to avoid exacerbations to his asthma.  (ECF No. 17, PageID.867.)  However, Plaintiff does not explain how this incorrect characterization would change the ALJ's ultimate inference that C.E. was physically active, and indeed, it is difficult to see how it could.

Also, the ALJ did not make his own independent medical findings.  Plaintiff argues that the ALJ disregarded "overwhelming medical evidence" in discounting plaintiff's testimony and determined C.E.'s medical condition based solely on C.E.'s apparent well-being at the hearing.  (ECF No. 17, PageID.867.)  Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s) . . . ."  20 C.F.R. §§ 404.1527(a)(2), 416.972(a)(2).   An ALJ need not "accept the opinion or theory of any medical expert, but may weigh the evidence and draw his own inferences."  *McCain v. Dir., OWCP*, 58 F. App'x 184, 193 (6th Cir. 2003).  The ALJ is "required to consider" the "quality" of medical expert opinions. *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009).  However, an ALJ "may not substitute his own medical judgment for

33

that of the treating physician where the opinion of the treating physician is supported by the medical evidence." *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006); *see also Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015).

The rule that an ALJ may not "play doctor" is hardly applicable here. The rule prohibits an ALJ from substituting his own independent medical findings for those of a medical expert. *See McCain v. Dir.*, 58 F. App'x at 193. That is not what has happened here. Only two medical experts opined on C.E.'s asthma. The first, Dr. Lazzara opined that C.E. displayed "moderate and persistent" asthma that was "controlled on treatment." (ECF No. 12, PageID.662–64.) The second, Dr. Schwartz, opined that C.E. displayed less than marked limitations in health and well-being. (*Id.* at PageID.51.) These sources support the ALJ's decision. Interestingly, Plaintiff seems to claim that the ALJ's decision constituted his "independent medical opinion" because it contradicted the testimony of C.E.'s mother and other evidence that did not come from a medical expert. However, this is entirely valid—the ALJ simply weighed medical and nonmedical sources; he did not substitute his own medical opinion for that of an expert. *See McCain*, 58 F. App'x at 193; *cf. Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 246 (6th Cir. 2016). Thus, I suggest that substantial evidence supports the ALJ's decision to discount the credibility of Plaintiff's statements.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (ECF No. 17), be **DENIED**, the Commissioner's Motion for Summary Judgment, (ECF No. 20), be **GRANTED**, and this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 12, 2021                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge